IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-01970-MSK-MJW


ALAN L. WATTS, on behalf of himself
and all others similarly situated,

        Plaintiffs,

v.

AMERICAN EXPRESS COMPANY &
AMERICAN EXPRESS TRAVEL
RELATED SERVICES COMPANY, INC.,

        Defendants.

---

## RECOMMENDATION REGARDING
## PLAINTIFF WATT'S MOTION TO CERTIFY CLASS (DOCKET NO.  60)

---

**Entered by United States Magistrate Judge Michael J. Watanabe**


This matter was before the court for oral argument on January 27, 2010, on Plaintiff

Watt's Motion to Certify Class (docket no. 60).  The court has now reviewed the subject motion

(docket no. 60), the response (docket no. 71), and the reply (docket no. 72) as well as the

massive attachments and massive case law presented by the parties in their moving papers.   In

addition, the court has taken judicial notice of the court's file and has considered applicable

Federal Rules of Civil Procedure and case law.  The court now being fully informed makes the

following findings of fact, conclusions of law, and recommendation.

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

## JURISDICTION, VENUE AND DUE PROCESS

The court finds that it has jurisdiction over the subject matter and over the parties to the lawsuit, that venue is proper in the state and District of Colorado, and that each party has been given a fair and adequate opportunity to be heard on the subject motion (docket no. 60). The court further finds:

## THE CLAIM AT ISSUE

1.      Plaintiff contends that American Express improperly accessed his consumer credit report in violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.* Specifically, Plaintiff contends that American Express accessed his consumer credit report without a permissible purpose as set forth in 15 U.S.C. § 1681b.

2.      Plaintiff contends that he never applied for any accounts with American Express, but that accounts were opened in his name with American Express as a result of fraud or identity theft. Third Amended Complaint at ¶¶ 14-18. Plaintiff contends that American Express accessed the contents of his consumer credit report in September, October, and November 2006 without having a permissible purpose to do so. Id. at ¶¶ 22-27

3.      Plaintiff recognizes that the access to his credit report information at issue in this case, known as "soft" pulls or inquiries, is not shared with other creditors and has no affect on a person's credit score.

4.      Plaintiff seeks solely statutory and punitive damages pursuant to 15 U.S.C.

§ 1681n.  Third Amended Complaint at ¶ 43.  Plaintiff does not seek actual damages.  Indeed,

"Plaintiff stipulates that no compensable actual damages present when there is a 'soft inquiry'

into a consumer credit report."  Plaintiff's Memo at 33.  Moreover, Plaintiff does not assert a

claim that Defendants negligently violated the FCRA.  Thus, for Plaintiff to obtain any recovery,

he must demonstrate that American Express "willfully" violated the FCRA.

## PROCEDURAL POSTURE OF THE CASE

5.      Judge Watanabe set discovery deadlines in this case relating to class certification

only and required that Plaintiff file his Motion for Class Certification on or before April 2, 2009.

(docket nos. 22, 36).  Plaintiff filed a Motion to Compel Responses to Discovery (docket no. 40),

but Judge Watanabe denied the motion, concluding that, among other reasons, the request was

"unduly burdensome."  (docket no. 48).

6.      Plaintiff moved to certify a class.  (docket no. 45).  Judge Kreiger denied the

motion as moot.  (docket no. 57).  The Court reasoned that "Plaintiff's class allegations have

been constantly moving targets throughout this case" and that "Plaintiff has proposed at least

five different definitions for his proposed class."  Id. at 4.  The Court afforded Plaintiff an

opportunity to file a renewed motion for class certification, but stated that "**no further

refinements of the definition proposed in the newly-filed motion will thereafter be

permitted**."  Id. at 5.

7.     Plaintiff filed his renewed Motion for Class Certification.  (docket no. 60).  Judge

Krieger then referred that Motion to Judge Watanabe for a Report and Recommendation.

(docket no. 74).

**OTHER CASES AGAINST DEFENDANTS BROUGHT
BY PLAINTIFF'S COUNSEL AND OTHERS**

8.     One of Plaintiff's lawyers in this case previously brought a putative class action

against American Express alleging improper access to the plaintiffs' consumer credit reports.

*See* Barbella Dep. Ex. 5 (complaint in <u>Hirsch, et al. v. American Express Company, et al.</u>, Civil

Action No. 06-cv-00055, United States District Court, Eastern District of Texas).  In that case,

however, the Complaint asserted a negligence claim under Section § 1681o and sought the

recovery of actual damages.  <u>Id.</u> at ¶¶ 9, 18.

9.     Another of Plaintiff's lawyers in this case brought an action on behalf of an

individual plaintiff against American Express alleging improper access to the plaintiff's

consumer credit report.  <u>See</u> Barbella Dep. Ex. 18 (complaint in <u>In re Espinoza (Lowe v.</u>

<u>American Express Travel Related Services Company, Inc.</u>*)*, Civil Action No. 06-cv-5170, United

States Bankruptcy Court, Western District of Texas).  But again in that case, the Complaint

asserted a negligence claim under Section § 1681o and sought the recovery of actual damages,

including an award for "significant mental anguish and emotional distress from the on-going

invasion of her privacy."  <u>Id</u>. at ¶¶ 71-72.

10.     Plaintiff points to the lawsuit filed by Paulette Field against American Express in

support of its Motion.  <u>See</u> Barbella Dep. Ex. 4 (<u>Field v. Experian Information Solutions, Inc., et</u>

<u>al.</u>, Civil Action No. 05-2309, United States District Court, District of Kansas).  In that case, the

plaintiff asserted a negligence claim under Section § 1681o and sought the recovery of actual damages, including an award for "significant mental anguish and emotional distress from the on-going invasion of her privacy." Id. at ¶ 104.

11.     Plaintiff also submits to the Court in support of its latest motion for class certification the declaration of Frank R. Ferrarell, but Mr. Ferrarelli filed his own lawsuit against American Express. See Declaration of Louis Smith ("Smith Dec.") at Ex. A (First Amended Complaint in Ferrarelli v. American Express Travel Related Services, Case No. 09-cv-436, United States District Court, Southern District of Ohio). In that action, the plaintiff sought to recover actual damages. Id., Prayer for Relief. Indeed, in a Rule 26(f) Report filed with the court, counsel for the plaintiff indicated that he "intends to use the expert testimony of a forensic and clinical psychologist to indicate the impact of having his personal and confidential credit information unlawfully accessed on numerous occasions by Defendants." Smith Dec., Ex. B at p. 3.

## AMERICAN EXPRESS'S ACCOUNT MONITOR SYSTEM

12.     American Express's account monitor system requests information from consumer reporting agencies like Experian Information Solutions, Inc. ("Experian") (BT 15-6 to -20 and 19-13 to 20-9).[1] American Express requests information from Experian for its active customer base and for customers with closed accounts that have a certain balance. (BT 40-3 to -7). American Express does not obtain an entire credit report, but certain limited and customized attributes. Id. 40-11 to -22. In accordance with 15 U.S.C. § 1681b(f), American Express

---

[1] "BT" means the transcript of Richard Barbella.

provides Experian with a "general" certification that the information is being requested for a purpose that is authorized under the FCRA. (BT 225-18 to 226-1).

13.     American Express's computer systems are designed to suppress requests for information regarding consumers where it lacks a permissible purpose to obtain such information under the FCRA. <u>See</u> Response to Interrogatory 2. (Watts Dep., Ex. 32).

14.     Requests for customer information are governed by rules that control the account monitor computer system. (BT 68-20 to 70-24); Barbella Dep, Ex. 6.

15.     The account monitor system searches American Express's global risk management system ("GRMS") for codes that describe the status of an account and excludes from any request to a consumer reporting agency those accounts where American Express lacks a permissible purpose under the FCRA or otherwise decides not to obtain information regarding a customer. (BT 31-10 to 34-13). The rules governing the account monitor system suppress requests for consumer credit information based on fraud accounts, among others. (BT 66-23 to 68-10 and 153-24 to 154-7 and 222-3 to 224-6).

16.     While American Express suppresses requests for consumer credit information based on accounts that are coded as fraud, in 2006 American Express recognized that certain fraud accounts had not been coded within GRMS with the traditional fraud indicator that is picked up by the account monitor system. (BT 59-16 to 63-4). As a result, a team from American Express investigated and conducted significant research, and identified the accounts at issue.

17.     Because these accounts could not be re-coded using the traditional fraud indicator, a strategy flag was created and populated in GRMS for these accounts. Simultaneously, a rule was added to the account monitor system to suppress such accounts from being used as a basis to request consumer information.  (BT 82-10 to 83-10 and 91-2 to -8).  The strategy flag implementation began in September 2006 and was completed on October 10, 2006. (BT 175-2 to -10 and 235-9 to -24).  Those changes prevented American Express from requesting consumer credit information based on those accounts.  (BT 242-6 to -21).  The strategy flag was placed on all accounts that were identified, regardless of whether the person also had other accounts with American Express at the time.  (BT 91-9 to -22).

18.     Plaintiff had five accounts opened in his name.  (BT 114-22 to 115-5 and 167-24 to 168-2).  In response to Plaintiff's claim of fraud, American Express released him from liability on the accounts (American Express thus suffered the financial loss from the alleged fraud).  The strategy flag was placed on Plaintiff's accounts on October 10, 2006.  (BT 234-23 to 235-24 and Barbella Dep. Ex. 27).

19.     While Plaintiff produced an Experian report indicating access by American Express to his information in November 2006, American Express's records from the account monitor system indicate that the last time such a request was made regarding Plaintiff was in October 2006.  (BT 138-1 to -23 and 141-24 to 142-19).  In any event, it is undisputed that no requests were made after November 2006.  It is also undisputed that Plaintiff never raised with American Express any concern or complaint regarding access to his consumer credit report at

any time before filing suit on September 12, 2008.  *See* Request to Admit No. 7 (Watts Dep. Ex. 15).

### THE DEPOSITION TESTIMONY OF PLAINTIFF ALAN L. WATTS

20.     Plaintiff was deposed in this case on February 27, 2009.

21.     Plaintiff was born in 1930.  (WT 9-10 to -11).[2]  He worked as an emergency room physician in Denver until 1990.  Thereafter, he filled in at the emergency room "a couple of times," the last time being in 1998.  (WT 10-3 to -13).  In 2000, Plaintiff became involved with companies called Health Matrix and E-Scan, which provided MRI services in Texas.  Plaintiff's son, Alan L. Watts, Jr., facilitated Plaintiff's involvement with those companies, and introduced Plaintiff to John Williams, whom Plaintiff's son had been involved with in another business venture.  Plaintiff served on the Board of Directors of the companies and "contributed most of the money."  (WT 11-1 to 13-17).

22.     The companies stopped operating in 2002, and Plaintiff contends that he and his son were defrauded by Williams.  Plaintiff contends that Williams obtained his social security number and other personal identifying information and opened up accounts in Plaintiff's name at various financial institutions.  (WT 18-9 to 19-1).

### A.     Plaintiff Does Not Know or Interact With His Lawyers

23.     The deposition testimony indicates that Plaintiff does not know or interact with his lawyers.

---

[2]  "WT" means the transcript of the deposition of Plaintiff Alan Watts.

24.     In connection with the alleged fraud perpetrated by Williams, Plaintiff's son retained H. Anthony Hervol (one of Plaintiff's lawyers in this case).  Both reside in San Antonio, Texas, and they knew each other previously.  (WT 15-16 to 17-6).

25.     Two or three years ago, at his son's request, Plaintiff met Mr. Hervol.  (WT 17-7 to 18-3).  That was the only time Plaintiff met Mr. Hervol in person (except he met with him the day before his deposition in this case).  (WT 20-9 to -14).  Plaintiff testified as follows:

> Q:  And as a result of that meeting three years ago, did you retain
> Mr. Hervol to provide legal advice to you?
>
> A:  He was the legal person for my son, and it's basically that.

(WT 20-15 to -19).

26.     Plaintiff never signed an engagement letter with Mr. Hervol, or any other lawyer who is representing him in this case.  (WT 21-8 to -17).  Other than at that meeting three years ago and the meeting the day before his deposition, Plaintiff has not spoken with Mr. Hervol.  (WT 22-9 to -14).

27.     Plaintiff testified that he met Benjamin Bingham, another of his lawyer's in this case, for the first time about two months prior to his deposition in this case.  (WT 19-24 to 20-1).  He testified as follows:

> Q:  How was it that you came to meet Mr. Bingham?
>
> A:  My son had talked about Mr. Bingham for some period of
> time.  And then about two months ago or so -- and I don't really
> know the particulars of this, but Mr. Bingham was with some other
> attorney, and we ended up having lunch together.  And that's
> basically all I remember about that.
>
> Q:  Do you remember what was discussed at the lunch?

A:  Probably just how good the steaks were or how good the food was.

(WT 23-18 to 24-4).  Other than that meeting (and a meeting the day before he was deposed), Plaintiff has not spoken with Mr. Bingham.  (WT 22-4 to -8).

28.     Attorneys Tara E. Gaschler and Thomas J. Lyons, Jr., have also entered appearances in this case on behalf of Plaintiff, although Mr. Lyons has withdrawn from the case. (docket nos. 66  and 70).  Plaintiff initially testified he was not aware that they were representing him.  Moreover, Plaintiff testified that he has never spoken with either of them about this case. (WT 22-15 to 23-5).

29.     After reviewing the signature page on Plaintiff's Original Complaint, Plaintiff testified that "[m]aybe" Ms. Gaschler is representing him, but "I don't know."  (WT 65-9 to -16).  Plaintiff testified that he met with Ms. Gaschler some time between one month and two weeks prior to his deposition.  At that meeting, Plaintiff said "hello and met with her and that was basically it" and he did not recall "if I specifically talked about this case."  (WT 65-17 to 66-11).  That was the only time Plaintiff met with or spoke with Ms. Gaschler.  (WT 66-12 to -16).

30.     Again, after reviewing the signature page of Plaintiff's Original Complaint, Plaintiff testified that he "think[s]" Mr. Lyons is representing him.  Plaintiff testified he met with Mr. Lyons on one occasion about a month ago, they did not discuss this case, and he has never spoken with Mr. Lyons on the telephone.  (WT 66-17 to 67-19).

31. In sum, Plaintiff testified that he never discussed this case or the underlying facts and circumstances with his lawyers in this case prior to a meeting the day before he was deposed:

> Q: Have you had discussions between yourself, your son, and either Mr. Bingham or Mr. Hervol?
>
> A: I've had discussions with my son, but I have not talked with Mr. Bingham or Mr. Hervol about this.
>
> Q: When you say about this, what are you referring to?
>
> A: About the case you are talking about.
>
> Q: So you haven't talked with them about this particular case?
>
> A: Not until now, basically.
>
> Q: When you say not until now, are you talking about the meeting you had yesterday when you testified earlier?
>
> A: Yes.
>
> Q: Prior to this time, you never discussed this case with them.
>
> A: Basically, that's correct.
>
> Q: Had you discussed the case with your son prior to --
>
> A: I may have, but I don't recall all the things I discussed with my son.

(WT 76-3 to -24).

**B.     Plaintiff Delegated All Matters Arising From Williams's Purported Fraud**

32. The deposition testimony indicates that Plaintiff delegated all matters arising out of the alleged fraud of John Williams.

33.     After Plaintiff became aware of Williams's alleged fraud in 2002, he retained a Denver lawyer named Bradley S. Freedberg to represent him.  (WT 26-22 to 27-20).  Over the last four or five years, Plaintiff has relied on his son to handle matters relating to Williams's alleged fraud.  (WT 15-16 to 16-4).  Plaintiff testified that he stopped using Mr. Freedberg because "it all went to my son.  My son was basically in charge of everything."  (WT 30-1 to -8). Plaintiff testified that his son was the person who would speak with Mr. Hervol.  (WT 15-16 to 16-4).  Those discussions between Plaintiff's son and Mr. Hervol have continued after the filing of this lawsuit, but Plaintiff's son has not informed Plaintiff about the content of his discussions with Mr. Hervol.  (WT 16-5 to -8).  Plaintiff testified that his discussions with his son were limited to "[v]arious vague discussions of the whole thing" addressing "the way we've gotten duped" and "lost money."  (WT 16-9 to -15).

34.     Plaintiff's delegation of responsibilities to his son includes the prosecution of this case.  Plaintiff alleges in his Amended Complaint that the last time American Express improperly accessed his consumer credit report was in November 2006 (Third Amended Complaint at ¶27), but he did not file this case until September 12, 2008.  Plaintiff explained the delay resulted from his son and his son's lawyers deciding when to proceed.  (WT 74-15 to 75-4).

35.     American Express received several written communications in February 2006 that purported to be from Plaintiff.  (Watts Dep. Ex. 6, 7, 10).  They were not from Plaintiff, but presumably were from his son.  They contained a facsimile number from Texas.  Plaintiff was unaware of these written communications and did not specifically authorize that they be sent.

(WT 38-3 to 42-10). One of the documents contained a handwritten "note" that stated "since my signature has been falsified on Amex docs - I will not provide it here." (Watts Dep., Ex. 10). It nevertheless then went on to place a signature on the bottom of the letter. Plaintiff never saw this letter before his deposition, did not draft it, did not sign it, the handwriting on the letter is not his, and he never instructed anyone to send it. (WT 44-24 to 45-25).

**C.      Plaintiff Was Not Involved in Responding to Discovery Demands**

36.      The deposition testimony indicates that Plaintiff was not involved in responding to discovery demands.

37.      Plaintiff was not aware that American Express had served written discovery requests in this case. (WT 32-12 to -18). He did not give any documents to his lawyers in this case, and he did not check his files for documents he may have relating to this case. (WT 32-24 to 33-6). Plaintiff testified that he had a "pile" of documents "that has to do with Health Matrix," but he did not provide those documents directly to his lawyers in this case. Some time in the past he "think[s]" he sent the documents to his son, who may have given them to his lawyers in this case, but Plaintiff does not know for sure if that happened. (WT 55-7 to 56-1).

38.      He did not contact Bradley Freedburg and request that he provide his lawyers in this case with the documents in his files. (WT 33-7 to -10). He did not ask his son to give his lawyers documents that relate to this case. (WT 33-11 to -17). Plaintiff's attorneys did produce some documents on behalf of Plaintiff, but Plaintiff was unaware of what documents were produced to American Express in discovery. (WT 95-2 to -20).

39.     In response to American Express's written discovery demands, Plaintiff's

attorneys served "Plaintiff's Objections and Responses to Defendants' First Set of

Interrogatories, Requests for Production of Documents and Requests for Admissions"

("Plaintiff's Responses").  (Watts Dep., Ex. 15).  Plaintiff testified that he saw Plaintiff's

Responses for the first time the day before his deposition.  (WT 83-7 to -17).  In response to a

question about whether he understood what the document was, Plaintiff responded "I really

don't.  I don't understand much of anything that goes on."  (WT 83-18 to -20).

40.     Plaintiff testified that he did not draft or review a draft of the responses to the

interrogatories.  Moreover, he never approved the answers before they were served:

> Q:  Prior to reading it either now or looking at it yesterday, did you
> approve it prior to that time?
>
> A:  No, because I didn't know anything about it.

(WT 86-24 to 87-3).  Plaintiff identified his signature on page seventeen of Plaintiff's

Responses, which certified the answers to the interrogatories, but he did not recall signing the

document and could not recall where he was when he signed it.  Moreover, he did not understand

that his signature and certification related to the preceding answers to interrogatories.  (WT 95-

25 to 97-5).

### D.     Plaintiff is Not Involved With This Litigation

41.     The deposition testimony indicates that Plaintiff has not been involved with this

litigation.

42.     Plaintiff was not sure if he had ever seen the Original Complaint filed in this

matter prior to his deposition.  (WT 50-13 to -22).  He never saw a draft of the pleading, did not

recall providing any comments, and was not sure what the Original Complaint was. (WT 51-10 to -12 and 54-10 to 55-1). Plaintiff never read the paragraph in the Original Complaint defining the class and was unaware of the process involved in drafting that language. (WT 64-5 to 65-8).

43. Plaintiff testified that he was unaware that an Amended Complaint had been filed in the case:

> Q: Are you aware that the complaint that was filed on your behalf in this matter was amended? Are you aware of that?
>
> A: I'm not aware of anything.

(WT 68-15 to -18). Not surprisingly then, he testified that he did not review a draft of the Amended Complaint, never had any discussions with anyone about the changes made in the Amended Complaint, and had "no idea" about why an Amended Complaint was filed. (WT 68-19 to 69-12). He did not have an understanding of the significance, if any, of the change made to class definition in the Amended Complaint. (WT 77-3 to 78-6).

44. Plaintiff was unaware that a representative of American Express had been deposed in this case. (WT 74-2 to -9). He had never seen either Plaintiff's or Defendants' Rule 26 Disclosures prior to his deposition and did not understand what they were. (WT 97-7 to -14 and 99-9 to -21). Plaintiff was unaware that a Rule 16 Scheduling Conference had been conducted in this case on December 2, 2009, and did not understand "anything" about such a conference. (WT 100-4 to 101-22). Plaintiff had not previously seen the Scheduling Order entered on December 12, 2008, and had "no idea" what is was. (WT 101-23 to 102-4). The Scheduling Order in Section 7 states "All parties have not consented to the exercise of jurisdiction of a magistrate judge," but Plaintiff did not understand the difference between a

magistrate judge and a district court judge and testified he did not "know about this at all." (WT 101-23 to 102-24).

45.     American Express responded to the Complaint by filing a Motion to Dismiss and to Strike the Class Allegations. There were various briefs and submissions by both Defendants and Plaintiff. In sum, Plaintiff testified with regard to this as follows: "I'm not aware of any of that. I don't know any of that." (WT 103-1 to -12). When asked if he authorized the filing of responding papers submitted on behalf of Plaintiff, he testified that "I know nothing about this document, so no." (WT 105-7 to -18). *See also* (WT 105-20 to 107-25).

46.     Plaintiff had not previously seen the deposition notices and response served in this case or the discovery demands served by Plaintiff on American Express or the responses of American Express, and had no understanding of what these documents were. (WT 108-2 to 110-25).

**E.     Plaintiff Has No Knowledge of the Factual Contentions in His Complaint**

47.     The deposition testimony indicates that Plaintiff has no knowledge of the factual contentions in his Complaint.

48.     Plaintiff's counsel served portions of certain credit reports of Plaintiff in discovery, but Plaintiff had not seen these reports before and did not request them himself. (WT 111-6 to 112-7 and 112-24 to 113-12 and 114-6 to -14 and 122-6 to -14 and 123-4 to -17). The basis of Plaintiff's claim is that American Express improperly accessed his consumer credit report, but Plaintiff testified that he first learned that American Express accessed his credit report the day prior to his deposition:

Q: Did there come a time that you learned that AMEX accessed your consumer credit report?

A: Yes.

Q: When did you learn that?

A: Recently from my attorneys.

Q: When you say recently, when was it?

A: Yesterday.

Q: Were you aware prior to that time that AMEX had access your consumer credit report?

A: No.

(WT 120-10 to -19).

49.     Plaintiff's complaint alleges that John Williams opened accounts with American Express in Plaintiff's name, and American Express released Plaintiff from liability on the accounts, but again Plaintiff has no knowledge:

Q: Is it your understanding that American Express released you from liability on the accounts that Williams opened?

A: I don't know anything about that.

(WT 124-20 to -23).

**F.      Plaintiff's Lawyers Exercise Absolute Control Over This Case**

50.     The deposition testimony indicates that Plaintiff's lawyers exercise absolute control over this case.

51.     In addressing questions regarding the initiation of this action, Plaintiff testified as follows:

Q: Did you instruct your attorneys to file this action on your behalf?

A: They do what they see is fit or what they determine is the right thing to do.

* * *

Q: But you don't specifically recall specifically authorizing your lawyers to file this document [the Original Complaint]?

[Objection by Mr. Bingham]

A: If I got attorneys that are representing us here, I think it's up to them to do what's right at the time.

(WT 52-8 to -11 and 53-23 to 54-9). Plaintiff's counsel invoked the attorney-client privilege and instructed him not to answer whether the idea to bring this case as a class action came from his lawyers. (WT 61-25 to 62-5). Plaintiff was unable to identify any responsibilities he has a result of filing this case as a class action. (WT 62-6 to 64-4).

### G. Plaintiff Does Not Understand He Waived Any Claim for Actual Damages

52. The deposition testimony indicates that Plaintiff is not aware that he has waived any potential claim for actual damages.

53. In contrast to prior Complaints that they filed, counsel for Plaintiff stipulate that no actual damages can be sustained as a result of "soft" credit pulls and no actual damages are being sought. However, at his deposition, Plaintiff testified that he did not believe he was waiving his right to any potential damages recovery and instead sought to recover "[w]hatever is allowed under the law." (WT 93-4 to 12).

### DECLARATIONS THAT CONTRADICT
### PLAINTIFF'S DEPOSITION TESTIMONY

54.     In support of the class certification motion, Plaintiff's counsel does not submit

any of the deposition testimony, but instead submits a contradictory declaration from Plaintiff.

At his deposition, Plaintiff testified as follows:

> Q:  Is there any reason you may have difficulty remembering
> things or giving accurate testimony?
>
> A:  As long as you speak clearly and I have my hearing aids in, I
> think I can probably understand things okay.

(WT 14-12 to -17).  Now, in his Declaration dated April 1, 2009, Plaintiff states:  "Since an

automobile accident in 2002, I have some short term memory problems which make it difficult

to sometimes remember names, dates or facts that I was exposed to in the short term."

Declaration of Alan L. Watts, M.D. at ¶ 4.

55.     In his deposition, Plaintiff testified that he had no involvement with responding to

the discovery demands served by American Express, but now in his Declaration he indicates that

he "answered discovery."  Id.  In his deposition, Plaintiff was unable to identify any of the duties

of a proposed class representative, but in his Declaration he now expresses an "understanding"

of such duties.  *Id.* at ¶ 3.

56.     Plaintiff's counsel also submits a seven-page declaration from Plaintiff's son,

who also is represented by Messrs. Hervol and Bingham in connection with credit-reporting

matters.  Declaration of Alan L. Watts, Jr. at ¶ 4.  He states that

> in 2002, my father was involved in a very bad car accident,
> followed by a long recovery, and so I began to be more involved
> with my father's affairs.  After he recovered, my father asked me

> to assist him in dealing with legal matters associated with the John
> Williams fraud case, as well as issues related to my credit. I have
> done this for my father since 2002.

Id. at ¶ 3. Beyond that, he states that "[i]n January, 2006, my father signed a formal power of

attorney so that I could fully deal with the legal matters on his behalf (and in his stead)

associated with the John Williams matters, and so that I could fully attend to his credit reporting

issues." Id. at ¶ 5.

57.    The power of attorney attached to Mr. Watts's declaration was not identified by

Plaintiff at his deposition or in his written discovery responses, and a copy was not produced by

Plaintiff's counsel as part of the document production in this case. The Power of Attorney

authorizes Plaintiff's son to "[i]nitiate, defend, commence or settle any legal actions on

[Plaintiff's] behalf, personally, corporate or business wise." Watts Jr. Dec., Ex. 1 (docket no.

61-5).

58.    In direct contradiction to his father's deposition testimony, Mr. Watts describes a

series of conversations that he and his father had with lawyers in this case. Id. at ¶¶ 5-11. He

states that he (not Plaintiff) is "the initial contact point for all communications regarding the

case" because of his "father's age and hearing problems, and because my father does not use e-

mail." Id. at ¶8. Contrary to Plaintiff's testimony, he states that he and the lawyers "have all

mailed to my father voluminous copies of documents regarding the case." Id. at ¶9. Contrary to

Plaintiff's testimony, he states that his father was involved in preparing answers to the

interrogatories served by American Express. Id. at ¶11.

59.     Mr. Watts explains the contradictions between his statements and Plaintiff's testimony as follows:  "It is my belief and observation that, since his auto accident, my father has a problem remembering certain matters unless they are presented to him in the same format and in the same setting.  Further, he has had some short term memory problems."  Id. at ¶12.

## PLAINTIFF HAS FAILED TO CARRY HIS BURDEN TO CERTIFY A CLASS

60.     The Tenth Circuit recently emphasized that "before a district court certifies a class it must ensure that the requirements of Rule 23 are met."  Vallario v. Vandehey, 554 F.3d 1259, 1266 (10th Cir. 2009); see also Rex v. Owens, 585 F.2d 432, 435 (10th Cir. 1978) (stating that Rule 23 sets forth "stringent guidelines").

61.     "District courts ensure Rule 23's provisions are satisfied by conducting a 'rigorous analysis,'" Vallario, 554 F.3d at 1267 (quoting Shook v. El Paso County, 386 F.3d 963, 968 (10th Cir. 2004), addressing the rule's requirements 'through findings,' regardless of whether these findings necessarily 'overlap with issues on the merits.'"  id. (quoting Shook v. Bd. of County Comm'rs, 543 F.3d 597, 612 (10th Cir. 2006)).

62.     The Tenth Circuit in Vallario made clear that it is aligned with those sister circuits that require a district court to conduct a "searching inquiry" and to make findings that all of the Rule 23 factors have been satisfied before certifying a class.  Id. at 1265.

63.     Initially, "[a]lthough not expressly required by Rule 23, Fed.R.Civ.P., it is obvious that the party seeking certification must establish that an identifiable class exists."  Daigle v. Shell Oil Co., 133 F.R.D. 600, 602 (D. Colo. 1990).

64. Next, in evaluating a request to certify a class, the district court must address the four following prerequisites in Rule 23(a):

> (1) Numerosity: "the class is so numerous that joinder of all members is impracticable";
>
> (2) Commonality: "there are questions of law or fact that are common to the class";
>
> (3) Typicality: "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and
>
> (4) Adequacy of representation: "the representative parties will fairly and adequately represent the interest of the class."

Trevizo v. Adams, 455 F.3d 1155, 1161-62 (10th Cir. 2006) (quoting Fed.R.Civ.P. 23(a)). "A party seeking class certification must show 'under a strict burden of proof' that all four requirements are clearly met." Id. at 1162 (quoting Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir. 1988)).

65. If the district court concludes that the requirements of Rule 23(a) have been satisfied, it still may certify a class only "if it finds the movant has also satisfied the conditions of either Rule 23(b)(1), (2), or (3)." Vallario, 554 F.3d at 1267. Moreover, "the same rigorous analysis should be applied to the Rule 23(b) elements." Clark v. State Farm Mut. Auto. Ins. Co., 245 F.R.D. 478, 481 (D. Colo. 2007).

66. Plaintiff contends that certification is warranted pursuant to Rule 23(b)(3). See Third Amended Complaint at ¶34. Certification under Rule 23(b)(3) is permissible only where "the court finds that questions of law or fact common to the class members predominate over any questions affecting individual members, and that a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy." These two requirements are generally referred to as predominance and superiority.

**A.      Plaintiff Fails to Establish an Identifiable and Ascertainable Class**

67.     Plaintiff's Motion should be denied because he fails to carry his burden to establish an identifiable and ascertainable class.

68.     A class must be defined by objective criteria and cannot be vague.  See, e.g., Federal Judicial Center, *Manual for Complex Litigation* (4th ed.) § 21.222 (stating that class definition "must be precise, objective, and presently ascertainable"); Perez v. Metabolife Int'l, Inc., 218 F.R.D. 262, 269 (S.D. Fla. 2003) ("A court should deny class certification where the class definitions are overly broad, amorphous, and vague . . .  ").

69.     In the Third Amended Complaint, Plaintiff defines the purported class as

> all United States residents who had no legitimately opened
> American Express accounts at the time that American Express
> accepted their claim that one or more American Express accounts
> had been fraudulently opened in their name, and whose credit file
> was, subsequent to American Express's acceptance of the account
> as a "fraud account" and on or after September 12, 2006, accessed
> by American Express for the stated purpose of conducting an
> "account review."

Third Amended Complaint at ¶28.

**1.      The Class Definition is Vague, Ambiguous, and Overbroad**

70.     Plaintiff seeks to exclude from the class people who had "no legitimately opened American Express accounts," but the term "legitimate" is impermissibly vague.  Whether a person is responsible for an account can raise a host of complex and contested issues.  See, e.g., Minskoff v. American Express Travel Related Servs. Co., Inc., 98 F.3d 703 (2d Cir. 1996)

(addressing rights and liabilities where employee opened American Express account in employer's name without informing employer); New Century Financial Servs., Inc. v. Dennegar, 928 A.2d 48, 49 (N.J. App. Div. 2007) (finding defendant liable for credit card balance despite defendant's contention he "never applied for or used the credit card" because defendant ceded authority for his finances to roommate who applied for and used card).

71.     The proposed class is overbroad because it includes people who opened accounts or established a credit relationship with American Express <u>after</u> American Express had accepted their claim that different earlier accounts had been opened through fraud.

72.     Additionally, the defined class is overbroad because it fails to exclude the numerous other ways in which American Express indisputably could have a permissible purpose in accessing a person's consumer credit report as reflected in 15 U.S.C. § 1681b.

73.     Because the class definition fails to exclude people with whom American Express unquestionably had a permissible purpose to access their credit report, the class definition is impermissibly overbroad.  See, e.g., Mazur v. eBay Inc., 257 F.R.D. 563, 567 (N.D. Cal. 2009) (rejecting class definition that included "non-harmed" people as "both imprecise and overbroad"); Owen v. Regence BlueCross BlueShield of Utah, 388 F. Supp. 2d 1318, 1334 (D. Utah 2005) (finding proposed class definition that included people who "suffered no damages" as overbroad); Zapka v. Coca-Cola Co., 2000 WL 1644539, *3 (N.D. Ill. Oct. 27, 2000) (finding proposed class "improperly includes individuals who were not harmed").

74.     The definition is further ambiguous because it uses the term "residents."  The FCRA creates potential claims for a "consumer," which defined to mean "an individual."  15

U.S.C. § 1681a(c).  The definition is also vague and ambiguous because it uses the term "credit file."  The claim asserted by Plaintiff concerns allegedly improper access to a "consumer report," which is defined at 15 U.S.C. § 1681a(d).  Plaintiff's definition does not indicate that "access" referred to in the definition relates to information held by a "consumer reporting agency."  15 U.S.C. § 1681a(d)(1).

75.    Plaintiff's use of the language "that American Express accepted their claim that one or more American Express accounts had been fraudulently opened in their name" and "American Express's acceptance of the account as a 'fraud account'" is also vague and ambiguous.  As was the case with Plaintiff, in certain instances when a person contacts American Express and contends that an account was opened as a result of fraud, American Express will agree to relieve that person from liability for the account.  Finally, use of the term "account review" is vague and ambiguous as it is undefined.

### 2.    The Class Definition Requires Arduous Individualized Assessments

76.    The class definition further fails because it requires an assessment of each person's circumstances to determine class membership.  An objectively defined class is one that "does not  . . . call for individualized assessments to determine class membership."  Stewart v. Cheek & Zeehandelar, LLP, 252 F.R.D. 387, 391 (S.D. Ohio 2008).  See also Vaszlavik v. Storage Tech. Corp., 175 F.R.D. 672, 683 (D. Colo. 1997) (reasoning that "the class description must be sufficiently definite so that it is 'administratively feasible' for the court to determine whether a particular individual is a member").

77.     To determine class membership for each individual person, an individualized inquiry will need to be conducted addressing, among other things, the following:  (1) whether the person had any "legitimate" American Express accounts; (2) at the time that American Express accepted a contention that one or more accounts had been fraudulently opened in that person's name; and (3) thereafter American Express accessed that person's "credit file."  As part of this effort, the Court will need to resolve any issues surrounding "legitimate" American Express accounts.  Moreover, the analysis of American Express's records would be a completely manual process that will at best yield only limited information.

78.     Requiring American Express to go back and identify people who had their consumer credit reports accessed as a result of a fraud account prior to the implementation of the strategy flag would involve an intensive manual process in which records from various systems within the company would need to gathered and evaluated for each person.

79.     Beyond that, American Express's records likely will not be able to determine whether access to information in September 2006 took place prior to the September 12, 2006, start of the class period or after, and instead input will likely need to be sought from a third party (i.e., Experian).  The need for such input is reflected here, where Plaintiff contends that American Express accessed his credit report in November 2006, but American Express's records do not show such access.

80.     Because the determination of class membership will require onerous, individualized inquiries, the class definition put forward by Plaintiff is untenable.  See Ramirez v. Palisades Collection, LLC, 2007 WL 4335293, *3, 6 (N.D. Ill. Dec. 5, 2007) (where class

definition required "an exhaustive, individualized inquiry" into defendant's "own files or those of another entity," court held "class definition is insufficient because determining class membership would require an onerous, individualized investigation"); <u>Sadler v. Midland Credit Mgmt., Inc.</u>, 2008 WL 2692274, *3, 6 (N.D. Ill. July 3, 2008) (following <u>Ramirez</u> and reasoning that "proposed class is identifiable only if the information necessary to identify those class members is available through 'ministerial review' rather than 'arduous individual inquiry'" and rejecting class definition that required evaluation of "the individual facts of each account").

**B.      Plaintiff Fails to Establish Numerosity**

81.      Plaintiff's Motion should be denied because he fails to carry his burden to establish numerosity.

82.      "In class action suits there must be presented some evidence of established, ascertainable numbers constituting the class in order to satisfy even the most liberal interpretations of the numerosity requirement." <u>Rex</u>, 585 F.2d at 436.  The party asserting the existence of a class must produce "some evidence or otherwise establish by reasonable estimate the number of class members who may be involved." <u>Id.</u>  Moreover, a "claim of numerosity that is based on speculation does not satisfy the numerosity requirement." <u>Swanson v. Town of Mountain View</u>, 2008 WL 786315, *2 (D. Colo. March 20, 2008).

83.      While the record reflects that approximately 15,000 accounts received the fraud strategy flag, the account monitor system is customer based and not account based.  Multiple accounts could be linked to one customer.  (BT 106-7 to 107-15).  Plaintiff, for example, had five accounts opened in his name.

84. Moreover, Plaintiff in his latest class definition limits the class to people "who had no legitimately opened American Express accounts at the time that American Express accepted their claim that one or more American Express accounts had been fraudulently opened in their name." Third Amended Complaint at ¶ 28. Thus, all of the identified accounts connected to people who had other accounts with American Express that were not alleged to have been opened through fraud are excluded from the latest class definition. (BT 91-9 to 92-10).

85. Moreover, implementation of the strategy flag began in September 2006, and the class period does not begin until September 12, 2006. American Express's records reflect only the first day of the month, and not the exact date that consumer information was accessed. (BT 120-14 to 121-4). In light of the record, Plaintiff cannot carry his burden to establish numerosity.

86. Finally, the class is defined to include people who had their credit files accessed by American Express "for the stated purpose of conducting an 'account review.'" Third Amended Complaint at ¶28. But American Express, in accordance with 15 U.S.C. § 1681b(f), provides Experian with a "general" certification that the information is being requested for a purpose that is authorized under the FCRA. (BT 225-18 to 226-1). Indeed, even the Third Amended Complaint takes a broader approach and describes the certification provided by American Express as seeking "the information because it had a legitimate need for the information in connection with a business transaction initiated by Dr. Watts or to review an account to determine whether Dr. Watts continued to meet the terms of said account." Third

Amended Complaint at ¶¶ 22-27.  In light of that class definition, Plaintiff cannot establish numerosity.

### C.    Plaintiff Fails to Establish Typicality

87.    Plaintiff's Motion should be denied because he fails to carry his burden to establish typicality.

88.    Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  "The typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiff's claims."  General Tel. Co. of the Northwest, Inc. v. Equal Opportunity Employment Comm'n, 446 U.S. 318, 330 (1980). "The essence of the typicality requirement is captured by the notion that as goes the claim of the named plaintiff, so goes the claim of the class."  Deiter v. Microsoft Corp., 436 F.3d 461, 466 (4th Cir. 2006) (quoting Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 340 (4th Cir. 1998) (quoting Sprague v. Gen. Motors Corp., 133 F.3d 388, 399 (6th Cir. 1998) (internal quotations omitted))).

89.    "The representative party's interest in prosecuting his own case must simultaneously tend to advance the interests of the absent class members."  Deiter, 436 F.3d at 466.  As a result, "it follows that an appropriate analysis of typicality must involve a comparison of the plaintiff's claims or defenses with those of the absent class members."  Id. at 467.  Thus, "the *individual factual circumstances* underlying the legal theory and legal claims of the representative must be sufficiently similar to those of the class."  In re Schering Plough Corp. ERISA Litig., ___ F.3d ___, 2009 WL 4893649, *7 (3d Cir. Dec. 21, 2009).

90.     Plaintiff's case concerns allegedly impermissible access to his consumer credit report in September, October, and November 2006.  It is undisputed that Plaintiff never contacted American Express about this issue prior to filing suit in September 2008, but American Express stopped any further access to Plaintiff's consumer report by placing a strategy flag on the accounts opened in Plaintiff's name on October 10, 2006.  Thus, American Express identified an issue with certain fraud accounts, and then designed and implemented a solution, including the placement of the strategy flag on the identified accounts by October 10, 2006 (including the accounts opened in Plaintiff's name).  Plaintiff does not allege negligence or seek actual damages, so to obtain recovery Plaintiff must prove that, despite all the pro-active efforts to address the situation with certain fraud accounts, American Express willfully violated the FCRA.

91.     In support of his motion, Plaintiff points to Frank Ferrarelli as a member of the putative class.  The circumstances surrounding Mr. Ferrarelli's claim are different from Plaintiff's.  Mr. Ferrarelli alleged that American Express relieved him of liability in connection with an account opened in his name on May 5, 2007.  Ferrarelli Dec. at ¶ 3.  He further alleged that American Express improperly accessed his credit file in June 2007 and January 2009.  Id. at 4.  While Plaintiff's claim concerns American Express's implementation of the strategy flag on historical accounts that had been recognized previously (and going back years) as being opened through fraud, Mr. Ferrarelli's claim concerned American Express's handling of a fraud account after the strategy-flag solution had been implemented in 2006.

92.     Thus, Mr. Ferrarelli's claim would likely have sought to address American Express's policies and procedures after implementation of the strategy flag in 2006 to suppress accounts that are later determined to be fraudulent.  Mr. Ferrarelli would likely have sought to frame the question as whether American Express, after having addressed the issue in 2006 through the implementation of strategy flags on the historical fraud accounts (like Plaintiff's), took appropriate steps thereafter to prevent future issues from arising with fraud accounts.  These differences are significant because again the claim of Plaintiff requires proof of a <u>willful</u> violation of the FCRA.  Moreover, Mr. Ferrarelli sought to recover actual damages, and intended to offer expert testimony to support that claim.  <u>See</u> Smith Dec., Exs. A and B.  Indeed, Mr. Ferrarelli opted to file his own lawsuit, rather than have his claim rise or fall based on Plaintiff's claim.

93.     Plaintiff's argument in favor of typicality "was made at an unacceptably general level."  <u>Deiter</u>, 436 F.3d at 467 (affirming trial court's denial of class certification based on failure to establish typicality).  Instead, the Court should "[e]xamin[e] typicality at a more directly relevant level," which results in the identification of "meaningful differences between plaintiffs' claims and those of" absent class members.  <u>Id.</u>  Such an examination, as set forth above, demonstrates that typicality is not met.

94.     Moreover, Plaintiff's contradictory deposition and declaration testimony creates a defense that precludes class certification.  Courts reason that

> inconsistent testimony could create serious problems with respect to plaintiff's credibility and could become the focus of cross-examination and unique defenses at trial, to the detriment of the

> class. These credibility problems are a basis for denying plaintiff's
> motion to be named class representative.

Darvin v. Int'l Harvester Co., 610 F. Supp. 255, 257 (S.D.N.Y. 1985) (collecting cases). See

also Weinstein v. American Biomaterials Corp., 123 F.R.D. 442, 466 (S.D.N.Y. 1988) (denying

class certification motion where plaintiff's "credibility is subject to serious question and serious

doubt").

### D. Plaintiff Fails to Establish Adequacy of Representation

95. Plaintiff's Motion should be denied because he fails to carry his burden to

establish adequacy of representation.

96. Adequacy of representation "is a factual determination dependent on the

circumstances of the case" that addresses the following:

> "A finding of adequacy includes the findings that the plaintiffs are
> knowledgeable as to the status and underlying legal basis for the
> action, that they are willing and able to pay notification and other
> cost, they will diligently pursue their claims, and that their
> interests are not antagonistic to the interests of the class."

Manasfi v. Malone, 2007 WL 891871, *6 (D. Colo. March 22, 2007) (quoting In re Storage

Tech. Corp. Securities Litig., 113 F.R.D. 113, 118 (D. Colo. 1986)). See also Rutter & Wilbanks

Corp. v. Shell Oil Co., 314 F.3d 1180, 1187-88 (10th Cir. 2002) (stating legal adequacy addresses

following questions: "'(1) do the named plaintiffs and their counsel have any conflicts of

interest with other class members and (2) will the named plaintiffs and their class counsel

prosecute the action vigorously on behalf of the class?'") (quoting Hanlon v. Chrysler Corp., 150

F.3d 1011, 1020 (9th Cir. 1998)).

97.     "Additionally, the plaintiffs' counsel must be competent and experienced in the particular substantive area." <u>In re Storage Tech. Corp. Securities Litig.</u>, 113 F.R.D. 113, 117-118 (D. Colo. 1986).  Because neither Plaintiff nor his counsel can adequately represent the class, the motion should be denied.

### 1.     Plaintiff is Not an Adequate Class Representative

98.     Plaintiff is not an adequate class representative.

99.     A threshold issue in evaluating the adequacy of Plaintiff is whether the Court should consider the declaration of Plaintiff submitted in connection with the motion for class certification.  Although Plaintiff was deposed, Plaintiff submits only a brief declaration that contradicts his deposition testimony.

100.     The Tenth Circuit has recognized that "courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." <u>Franks v. Nimmo</u>, 796 F.2d 1230, 1237 (10th Cir. 1986).  Courts look at the following factors to evaluate the existence of a sham fact issue:  "whether the affiant was cross examined during his earlier testimony, whether the affiant had access to pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." <u>Id.</u>

101.     The court will treat the declaration as a sham and disregard it.  At his deposition, Plaintiff was subject to cross-examination, there is no newly-discovered evidence, and Plaintiff was not "confused" by the questions.

### a.     Plaintiff is Relying Blindly on His Lawyers and Son

102.     In light of the deposition testimony, Plaintiff is not an adequate class representative and cannot fulfill the fiduciary duties required of a class representative.  Plaintiff's testimony demonstrates that he lacks any knowledge of the facts regarding his case, lacks any knowledge of what has transpired in the litigation, fails to understand any responsibilities of  a class representative, and is relying completely on his lawyers and his non-party son.

103.     It is well settled in the Tenth Circuit and elsewhere that "'inquiry into the knowledge of the representative is [required] to ensure that the parties are not simply lending their names to a suit controlled entirely by the class attorney.'"  Kelley v. Mid-America Racing Stables, Inc., 139 F.R.D. 405, 410 (W.D. Okla. 1990) (quoting 7A Wright, Miller, and Kane, *Federal Practice & Procedure* § 1766) (2d ed. 1986) (stating that where representative has "lack of knowledge or understanding concerning what the suit is about, then the court may conclude that Rule 23(a)(4) is not satisfied").  See Reed v. Bowen, 849 F.2d 1307, 1313 (10th Cir. 1988) (stating that adequacy determination requires inquiry into "'the stature and interest of the named parties themselves'" (quoting 7A Wright, Miller, and Kane, *Federal Practice & Procedure* § 1766 (2d ed. 1986)); In re Storage Tech. Corp. Securities Litig., 113 F.R.D. at 118-119 (finding representative inadequate where he did "not appear to be exercising independent judgment in this case" and concluding "the class is entitled to more than blind reliance on counsel").

104.     Courts deny class certification "when 'the class representatives had so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.'"  Kelley, 139 F.R.D. at 409 (quoting Kilpatrick v. J.C. Bradford & Co., 827 F.2d 718, 727 (11th

Cir. 1987)); <u>Maywalt v. Parker & Parsley Petro. Co.</u>, 67 F.3d 1072, 1077-78 (2d Cir. 1995)

(same); <u>Monroe v. City of Charlottesville</u>, 579 F.3d 380, 385 (4th Cir. 2009) (affirming denial of

class certification based on lack of adequacy and reasoning that findings that representative

"lacks sufficient interest, credibility, or either knowledge or an understanding of the case . . . are

grounds for denying class certification") (citing 7A Wright, Miller, and Kane, *Federal Practice*

*& Procedure* § 1766 (3d ed. 2005)).

105.    A court cannot certify a class where "the plaintiffs have abdicated their role to the

attorneys, who now have become the *de facto* plaintiffs." <u>Kelley</u>, 139 F.R.D. at 410 (finding

representative inadequate based on excessive reliance on attorneys). *See* <u>*Middleton v. Arledge*</u>,

2008 WL 906525, *12 (S.D. Miss. Mar. 31, 2008) (rejecting adequacy where suit controlled by

attorneys and Plaintiffs lacked knowledge of litigation and collecting cases); <u>Greenspan v.</u>

<u>Brassler</u>, 78 F.R.D. 130, 134 (S.D.N.Y. 1978) (rejecting adequacy where plaintiffs played

"superfluous role in this litigation to date").

106.    The record demonstrates that Plaintiff is blindly relying on his attorneys.  He is

completely uniformed about the case and believes that it is appropriate to let his attorneys handle

everything and make all decisions.  Based on the deposition testimony, the blind reliance is so

extreme that Plaintiff never discussed the lawsuit with his attorneys until the day before his

deposition and likewise did not know that American Express accessed his consumer credit report

(the basis for his claim) until the day before his deposition.

107.    Plaintiff testified that he also was relying on his son to address matters resulting

from the alleged fraud of John Williams, including this lawsuit, but that provides another basis to

reject the adequacy of Plaintiff.  Just as Plaintiff cannot delegate his fiduciary class

representative responsibilities to his lawyers, he cannot so delegate to his son.  A class

representative "must be able, at minimum, to make important nondelegable decisions about the

course of the litigation."  Smyth v. Carter, 168 F.R.D. 28, 33  (W.D. Va. 1996).

108.    While Plaintiff points out that Plaintiff's son is "interested in the case," Plaintiff's

Memo of Law at p. 22, the son's interest and involvement is a problem that further precludes

Plaintiff from serving as a class representative.  Troublingly, in this case, Plaintiff's son testifies

that it was his idea to sue American Express, not Plaintiff's idea.  Watts Jr. Dec. at ¶ 7.  See In re

Storage Tech. Corp. Securities Litig., 113 F.R.D. at 118 (finding representatives inadequate

where "idea to sue" came from their brother and "[t]heir presence as plaintiffs appears to be due

to [their brother's] interest in the case").

109.     Plaintiff further is inadequate because based on his deposition testimony he

failed to comply with discovery.  He testified he had a "pile" of documents, but he never gave

them to the lawyers in this case to produce in discovery.  "The failure to comply with proper

discovery is a sufficient basis for this court to conclude that these plaintiffs would not adequately

represent the class."  In re Storage Tech. Corp. Securities Litig., 113 F.R.D. at 118.

110.    Even if the Court considers the declarations submitted in addressing the adequacy

of Plaintiff, Plaintiff still fails to carry his burden that he is an adequate class representative.  The

contradictory declaration testimony states that Plaintiff was involved in an automobile accident

in 2002, and since that time Plaintiff "has had a problem remembering certain matters unless

they are presented to him in the same format and in the same setting" and he further "has had some short term memory problems."  Watts Jr. Decl. at ¶12.

111.    Courts will reject a finding of adequacy in light of "problems" with "physical and mental health," recognizing that they must "be concerned with the rights of the absent plaintiffs in a class action." Latona v. Carson Pirie Scott & Co., 1997 WL 109979, *2 (N.D. Ill. Mar. 7, 1997); see In re Teletronics Pacing Sys., Inc., 168 F.R.D. 203, 218 (S.D. Ohio 1996) (finding representative inadequate where his health will not allow him to travel); Edington v. R.G. Dickinson & Co., 139 F.R.D. 183, 195 (D. Kan. 1991) (finding representatives inadequate where their "age and poor health" precluded them from examining "independently the decisions of counsel" and from playing "an active role in the litigation for the protection of the class"); Roundtree v. Cincinnati Bell, Inc.,. 90 F.R.D. 7, 10 (S.D. Ohio 1979) (finding representative inadequate based on "mental factors").

112.    If Plaintiff's cognitive function is so impaired that he could not remember anything about interrogatories he certified less than a month before his deposition, or recall any of the events described in the contradictory declarations, he cannot be an adequate class representative.

### b.    Plaintiff Created a Conflict By Abandoning Any Negligence Claim and Claim for Actual Damages

113.    Plaintiff created a conflict with the class by abandoning any negligence claim or claim for actual damages.

114.    Other lawsuits alleging impermissible access to credit reports that were filed against American Express by the lawyers representing Plaintiff and others, both a class action

and individual actions, asserted negligence claims and sought recovery of actual damages (including emotional distress damages). Plaintiff's lawyers have changed course in this case and abandoned such theories and damages in an effort to bolster their chances of achieving class certification.

115. Courts find that the tactical abandonment of claims renders a plaintiff an inadequate class representative. See, e.g., Harper v. TransUnion, LLC, 2006 WL 3762035, *7 (E.D. Pa. Dec. 20, 2006) (reasoning in FCRA case "that a plaintiff who pursues statutory damages exclusively in this type of case would not adequately represent the interests of those putative class members who later wish to seek alternative grounds for relief, such as actual damages"); Western States Wholesale, Inc. v. Synthetic Indus., Inc., 206 F.R.D. 271, 277 (C.D. Ca. 2002) ("A class representative is not an adequate representative when the class representative abandons particular remedies to the detriment of the class."); Legge v. Nextel Comm., Inc., 2004 WL 5235587, *11 (C.D. Cal. June 25, 2004) (reasoning that "[o]ne of the essential aspects of adequacy is that the class representative assert a common right, 'such as achieving the maximum possible recovery for the class,'" and rejecting adequacy where the plaintiffs did "the opposite" and argued that they could not recover various "categories of actual damages, presumably because to do so might defeat the class nature of their case" (quoting In re Corrugated Container Antitrust Litig., 643 F.2d 195, 208 (5th Cir. 1981)); Clark v. Experian Information Solutions, Inc., 2001 WL 1946329, *4 (D.S.C. March 19, 2001) (reasoning in FCRA case that abandoning claim for actual damages "defeats adequate representation since it places absent class members at risk of having other claims forever barred by res judicata").

116.     Courts further reason that an opportunity for class members to opt-out of the class does not cure the problem raised by abandoning claims.  See, e.g., Gardner v. Equifax Information Services, L.L.C., 2007 WL 2261688, *6 (D. Minn. Aug. 6, 2007) (rejecting opt-out mechanism as means to ensure lack of conflict within class and reasoning that if plaintiff's view of the opt-out mechanism were adopted "any person would be an adequate representative of a proposed class so long as there were an opt-out procedure, and there would be no need for an adequacy requirement"); Clark, 2001 WL 1946329, *4 ("'The ability to opt out of the class is insufficient to protect the rights of putative class members who would want to seek remedies other than those chosen by the [class] representatives.'") (quoting Small v. Lorillard Tobacco Co., 679 N.Y.S.2d 593, 601-02 (App. Div. 1998)); Colindres v. Quietflex Mfg., 235 F.R.D. 347, 376 (S.D. Tex. 2006) ("Providing class members notice and an opt-out opportunity . . . are not a substitute for the adequate, conflict-free representation required under Rule 23(a)(4).").

117.     The conflict presented by Plaintiff's approach in this case is illustrated by the lawsuit filed by Mr. Ferrarelli.  In its prior memorandum in support of class certification, Plaintiff argued that if he is found to be inadequate, another person such as "Mr. Ferrarelli" could "fill Dr. Watts' shoes, or serve along side of him."  (docket no. 46 at 22).  To the contrary, Mr. Ferrarelli's lawsuit reveals the conflict between the approach taken by Plaintiff and other alleged members of the putative class.  While Plaintiff "stipulates that no compensable actual damages present when there is a 'soft inquiry' into a consumer credit report," Plaintiff's Memo at 33, Mr. Ferrarelli sought to recover actual damages, and intended to present "expert testimony of a forensic and clinical psychologist to indicate the impact of having his personal and

confidential credit information unlawfully accessed on numerous occasions by Defendants."

Smith Dec., Ex. B at p. 3. Plaintiff's position and Mr. Ferrarelli's position are in direct, actual

conflict.

> c. **The Preexisting Relationship Between Plaintiff, Plaintiff's Son, and his Counsel Creates a Conflict**

118.   According to the declarations submitted by Plaintiff, Plaintiff's counsel Mr.

Hervol has known Plaintiff and his son for over five years and has represented Plaintiff's son

since 2004. See Declaration of Mr. Hervol dated May 14, 2009, at ¶¶ 2, 4 (Dkt. Ent. 56-2). He

has represented Plaintiff's son in connection with credit reporting issues. Id. Mr. Bingham

likewise has previously represented Plaintiff's son in connection with a "credit issue." See

Declaration of Mr. Bingham dated Sept. 28, 2009, at ¶ 5 (Dkt Ent. 61-7). Additionally, on

January 5, 2009, Mr. Hervol, along with Ms. Gaschler and Mr. Lyons, filed a lawsuit on behalf

of Plaintiff against a law firm alleging a violation of the Fair Debt Collections Practices Act.

Smith Dec., Ex. C. In that case, Plaintiff thereafter filed a motion seeking leave to file a First

Amended Complaint that asserted a claim for impermissible access to his credit report. Id., Ex.

D. The case, however, apparently has settled. Id., Ex. E.

119.   "Courts will generally reject a named representative based upon a conflict of

interest created by a pre-existing relationship with class counsel." Eufaula Drugs, Inc. v. TDI

Managed Care Servs., Inc., 250 F.R.D. 670, 678 (M.D. Ala. 2008) (citing London v. Wal-Mart

Stores, Inc., 340 F.3d 1246, 1254-55 (11th Cir. 2003) (holding that court abused its discretion by

failing to consider plaintiff's personal and financial ties to class counsel)). This concern is

"especially true" in cases in which "attorney's fees will greatly exceed the class representative's recovery." Martz v. PNC Bank, N.A., 2007 WL 2343800, *5 (W.D. Pa. Aug. 15, 2007).

120.    While the focus traditionally has been on the relationship between the named plaintiff and class counsel, in light of the active role he plays in connection with this case, scrutiny is also required of the relationship with Plaintiff's son. Indeed, the Power of Attorney provided to Plaintiff's son authorizes him to "[i]nitiate, defend, commence or settle any legal actions on [Plaintiff's] behalf, personally, corporate or business wise." Watts Jr. Dec., Ex. 1 (docket no. 61-5).

121.    In light of the pre-existing relationship between Messrs. Hervol and Bingham and Plaintiff and his son, Plaintiff is not an adequate representative. Ms. Gashler also has represented Plaintiff in another matter, but in any event her role is limited to serving as "local counsel in this case." Decl.of Mr. Hervol dated May 14, 2009, at ¶ 11 (docket no. 56-2). Likewise, Mr. Lyons represented Plaintiff in another matter, but in any event has withdrawn from this case. (docket nos. 66 and 70). In light of the history regarding Plaintiff, his son, and his counsel, Plaintiff is not an adequate representative.

**d.    Plaintiff Refuses to Pay Notice Costs**

122.    Plaintiff also is an inadequate representative because is he unwilling to pay notice costs. Under Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178-79 (1974), a class action plaintiff typically bears the cost of notice to the class. Accordingly, the Tenth Circuit has "recognize[d] the necessity for the court to be satisfied that the plaintiff or plaintiffs can pay notice costs." Sanderson v. Winner, 507 F.2d 477, 480 (10th Cir. 1974). See In re Storage Tech. Corp.

Securities Litig., 113 F.R.D. at 118 (finding representative inadequate where they "appear to be in no position to provide the financial resources necessary to assure vigorous prosecution"). Here, Plaintiff testified he would be unable and unwilling to pay such costs.  (WT 88-15 to 89-9) ("Q:  You don't have the financial ability to pay for notice for the entire class?  A.  No.").

### 2. Plaintiff's Counsel is Not Adequate

123.    Plaintiff has not carried his burden to demonstrate that his counsel is adequate.

124.    "While there must be an active, interested, participating, named representative, the Court must also scrutinize the character, competence, and quality of counsel retained by the representative."  Smith v. Josten's American Yearbook Co., 78 F.R.D. 154, 163 (D. Kan. 1978) (internal quotation omitted and collecting cases), aff'd 624 F.2d 125 (10th Cir. 1980).  In addressing this element, "courts hold attorneys to a 'heightened standard' in light of their great responsibility to the absent class."  Id. (quoting Amos v. Bd. of Directors of City of Milwaukee, 408 F. Supp. 765 (E.D. Wisc. 1976)).

125.    Mr. Lyons was the attorney representing Plaintiff who has experience filing and settling these types of cases (no case like this has had a class certified in a litigated context or over the objection of a defendant), but he has withdrawn from this case, apparently due to a current disciplinary proceeding.  (docket nos.  66-70).  In prior court submissions, Plaintiff described Mr. Lyons as the attorney with the "experience and expertise to handle the matters involved in this case."  Plaintiff's Reply Brief at 32 (docket no. 56).  Indeed, Mr. Lyons was the attorney who conducted the deposition of Mr. Barbella of American Express, handled the initial scheduling conference before Judge Watanabe, and appeared to be the lead lawyer on the case.

126.    The disciplinary proceeding apparently prompting Mr. Lyons's withdrawal was filed on March 16, 2009 (docket no. 67), but it was not disclosed in Mr. Lyons' declaration or any other papers filed by Plaintiff on April 2, 2009, in support of his initial motion for class certification. (docket no. 46-8). In fact, American Express pointed out in challenging the adequacy of counsel the prior discipline and problems relating to Mr. Lyons, but in his reply filed on May 14, 2009, Plaintiff argued that Mr. Lyons should not be judged "based upon matter that are more than six years old" and again did not disclose or address the pending disciplinary action. Plaintiff's Reply Brief at 33 (docket no. 56).

127.    The "most revealing indication" regarding adequacy is "the conduct of the named plaintiff's case to date." Smith, 78 F.R.D. at 163. The problems start right at the beginning. According to testimony submitted by Plaintiff, on June 19, 2006, Plaintiff's counsel Mr. Hervol, Plaintiff, and Plaintiff's son obtained Plaintiff's Experian credit report and recognized that there were no American Express account tradelines, but American Express had accessed the credit report to conduct account reviews. Watts Jr. Decl. at ¶ 6.

128.    After learning those facts, Mr. Hervol did the following:

> Mr. Hervol conducted some research and found an attorney in Ohio who had sued American Express on behalf of another client named Paulette Field for the same conduct. Mr. Hervol reported to me that he had spoke with this attorney about pursuing a case on behalf of my father based upon these illegal credit pulls; however, the attorney was unable to take the case due to a recent childbirth and being very busy with other cases.

Watts Jr. Decl. at ¶ 6. Thus, after learning of the situation in June 2006, Mr. Hervol apparently called one lawyer who declined to take the case, and he did not further monitor the situation, raise it with American Express, or take any other steps.

129. Instead, in July 2008, when addressing an issue with another creditor who was trying to collect on accounts from Plaintiff, Mr. Hervol and Plaintiff's son saw more "account reviews" by American Express, although they had stopped completely in 2006. Id. at ¶ 7. This time Mr. Hervol opted to file a class-action lawsuit in September 2008. Mr. Hervol thus was aware of the issue in June 2006 when it was an on-going issue, but essentially did nothing, and then changed course in September 2008 and decided to launch a class-action lawsuit even though the issue had been resolved for nearly two years. The delay is prejudicial as the class identification problems addressed by Mr. Barbella in his testimony only become more severe with the passage of time.

130. All of Plaintiff's lawyers bear responsibility for the problems with the named Plaintiff. In light of his deposition testimony, Plaintiff is not an adequate representative. Plaintiff's counsel's effort to rehabilitate him or themselves by providing contradictory declaration testimony of Plaintiff only makes matters worse. See Byes v. Telecheck Recovery Servs., Inc., 173 F.R.D. 421, 427 (E.D. La. 1997) (finding adequacy not satisfied where named plaintiff submitted affidavit that contradicted deposition testimony and reasoning that "[t]he affidavit indicates to the court that [the plaintiff] places blind reliance on her attorneys, but even more so, it reflects poorly on the adequacy of counsel").

**E. Plaintiff Fails to Establish Predominance**

131.    Plaintiff has failed to carry his burden regarding predominance.

132.    Predominance "tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation," a standard that is "far more demanding than the commonality requirement of Rule 23(a)." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623-24 (1997).

133.    Because "the 'nature of the evidence that will suffice to resolve a question determines whether the question is common or individual,'" In re Hydrogen Peroxide Antitrust Litig., 552 F.3d at 311 (quoting Blades v. Monsanto Co., 400 F.3d 562, 566 (8th Cir. 2005)), "'a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case.'" Id. (quoting In re New Motor Vehicles Can. Exp. Antitrust Litig., 522 F.3d 6, 20 (1st Cir. 2008)).  "'If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable.'" Id. (quoting Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 172 (3d Cir. 2001)).

134.    The claim advanced by Plaintiff requires him to prove the following:  "(1) that there was a 'consumer report' within the meaning of the statute; (ii) that the defendant used or obtained it; and (iii) that the defendant did so without a permissible statutory purpose." Godby v. Wells Fargo Bank, N.A., 599 F. Supp. 2d 934, 938 (S.D. Ohio 2008) (collecting cases).

135.    Additionally, "the plaintiff must demonstrate that the defendant acted with the requisite degree of culpability -- either negligence, 15 U.S.C. § 1681o(a), or willfulness, 15 U.S.C. § 1681n(a) -- in order to impose civil liability under the FRCA." Id.  Plaintiff's claim

alleges that American Express "willfully" (there is no negligence claim) violated the FCRA by accessing his consumer credit report without a permissible purpose under 15 U.S.C. § 1681b, and seeks recovery of statutory damages between $100 and $1,000 per alleged violation.

136.    This type of claim is dominated by individual issues, and therefore predominance cannot be met.  See Klotz v. TransUnion L.L.C., 246 F.R.D. 208, 216 (E.D. Pa. 2007) (rejecting predominance in FCRA class action "because the question of whether each proposed class member could prevail on his or her claims required an individual determination").

### 1.    "Permissible Purpose" Inquiry is Individualized

137.    Because a class member must demonstrate that American Express accessed his or her consumer credit report at a time that it lacked a permissible purpose under 15 U.S.C. § 1681b(a)(3), individualized scrutiny regarding each class member is required.

138.    To demonstrate a basis for relief, an individual must demonstrate that American Express lacked any of the various permissible purposes set forth in 15 U.S.C. § 1681b(a)(3)(A) through (F) at the time of access.

139.    A claim based on 15 U.S.C. § 1681b(a)(3) requires the plaintiff to prove that none of the various permissible purposes of the statute authorized the particular access at issue. Godby, 599 F. Supp. 2d at 938-42 (analyzing facts and circumstances between plaintiff and defendant in evaluating claim based on alleged violation of § 1681b(a)(3)).  In light of the need for such individualized scrutiny, predominance cannot be met.

### 2.    "Willfulness" Inquiry is Individualized

140. Assuming a class member could establish that American Express accessed his consumer credit report without a permissible purpose, the inquiry into "willfulness" will require individualized scrutiny.

141. Based on the claim in this case, "any willfulness investigation will inherently involve individualized issues," and a "totality of the circumstances inquiry necessary to determine . . . willfulness . . . cannot occur on a class-wide basis." Gardner v. Equifax Information Services, L.L.C., 2007 WL 2261688, *8 (D. Minn. Aug. 6, 2007. See Barnett v. Experian Info. Solutions, 2004 WL 4032909, *5 (E.D. Tex. Sept. 30, 2004) (denying class certification for FCRA claims because "willfulness itself is a fact-bound inquiry" and the "determination of willfulness examines the totality of the circumstances involved in consumer's interaction with [the defendant]").

142. An aspect of the willfulness analysis is the interaction between the consumer and the creditor prior to the initiation of the lawsuit, and in particular whether the consumer has brought the issue to the attention of the creditor. See Veno v. AT&T Corp., 297 F. Supp. 2d 379 (D. Mass. 2003).

143. Here, the evidence that shows that Plaintiff never contacted American Express prior to filing suit. See Barnett, 2004 WL 4032909, at *5 (rejecting trial plan addressing willfulness that "would effectively strip [defendant] of the right to demonstrate [defendant's] interaction with absent class members").

144. The declaration submitted by Frank Ferrarelli further underscores why the willfulness inquiry must be performed on an individualized basis. Unlike Plaintiff, who had the

strategy flag put in place as part of the project completed on October 10, 2006, Mr. Ferrarelli

contended that he had his claim of fraud accepted in 2007 and that American Express continued

to access his credit report in 2009.  These differing circumstances demonstrate the need for

individualized scrutiny regarding each situation.

### 3. The Damages Inquiry is Individualized

145.  Plaintiff's effort to seek on behalf of a class statutory damages "of not less than

$100 and not more than $1,000" likewise requires individualized scrutiny.  15 U.S.C. §

1681n(a)(1)(A).

146.  Courts conclude that an analysis of the appropriate recovery under that statute

would "require considerable individualized inquiries," which would "be detailed and

predominate the common issues of fact and law."  Preston v. Mort. Guaranty Ins. Co., 2004 U.S.

Dist. LEXIS 28914, *15 (M.D. Fla. June 21, 2004); Glatt v. PMI Group, Inc., 2004 U.S. Dist.

LEXIS 28927, *16 (M.D. Fla. Sept. 7, 2004) (finding predominance not satisfied and reasoning

that "Court's determination of the amount of statutory damages would be determined based on

each class member's individual situation -- not on the least common denominator of the putative

class").

147.  In assessing the amount of statutory damages, one aspect of the individualized

scrutiny, as explained earlier this year by another court, is the number of violations that are

found.  Stillmock v. Weis Markets, Inc., 2009 WL 595642, *4 (D. Md. March 5, 2009)

(concluding that "as to the determination of damages, individualized questions substantially

predominate").

148.     This individual variation is shown by comparing Plaintiff, who alleges that American Express impermissibly accessed his credit report six times (Third Amended Complaint at ¶¶ 22-27) with Ms. Espinoza, who alleged that American Express impermissibly accessed her credit report twenty-three times. (Barbella Ex. 18 at ¶¶ 29-56). Moreover, the time period of the alleged violations varies significantly, as Plaintiff alleges violations between September and November 2006, while Mr. Ferrarelli alleged three violations covering the time period June 2007 and January 2009. Ferrarelli Dec. at ¶ 4.

149.     Additionally, a damages inquiry involves an individualized evaluation of whether any actual damages were sustained. See Andrade v. Chase Home Finance, LLC, 2005 WL 3436400, *6 (N.D. Ill. Dec. 12, 2006) (addressing question of whether "evidence of actual damages is at all important for calculating appropriate amount of statutory damages," reasoning that "common sense would indicate that such evidence is at least potentially quite meaningful," and citing and quoting Preston).

150.     That includes evaluating punitive damages, which the Supreme Court has determined "must bear a relationship to the amount of actual damages sustained by the party receiving the punitive damages award." Stillmock, Inc., 2009 WL 595642, *4 (citing BMW of N. Am. v. Gore, 517 U.S. 559, 580-81 (1996) ("The principle that exemplary damages must bear a 'reasonable relationship' to compensatory damages has a long pedigree.")).

**F.     Plaintiff Fails to Establish Superiority**

151.     Plaintiff has failed to carry his burden regarding superiority.

152.     "'Under the superiority test of Rule 23(b)(3), a class action must be better than, not merely as good as, other methods of adjudication.'"  Foster v. St. Jude Medical, Inc., 229 F.R.D. 599, 606 (D. Minn. 2005) (quoting 5 James Wm. Moore, *Moore's Federal Practice* § 23.46[1] (3d ed)).

153.     Rule 23(b)(3) identifies four non-exhaustive factors for a court to consider in addressing superiority:  1)  the class members' interests in individually controlling the prosecution of separate actions; 2)  the extent and nature of any litigation concerning the controversy already begun by or against class members; 3)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and 4)  the likely difficulties in managing the class.

### 1.     The Litigation Would be Unmanageable as a Class Action

154.     Plaintiff's proposed class would be unmanageable.

155.     The evidence presented by American Express demonstrates that "that there is no workable way to determine who the class members are and to give them notice of the class action."  Foster, 229 F.R.D. at 606.

156.     Additionally, because "permissible purpose," "willfulness," and damages must be addressed on an individualized basis, class treatment would create insurmountable manageability problems.  See Gardner, 2007 WL 2261688  at *7 (finding "manageability concerns" based on "individual nature" of  "willfulness" issue which would make class treatment "unwieldy").

### 2.     These Claims Can be Adequately Addressed Through Individual Actions

157.    A class action "is designed to provide compensation that cannot be achieved through normal channels" and thus "[i]nherent to this consideration is an examination of the remedies already available to plaintiffs without proceeding as a class." Clark v. State Farm Mut. Auto. Ins. Co., 245 F.R.D. 478, 489 (D. Colo. 2007).

158.    The FRCA claim at issue in this case provides for the recovery of attorney's fees, punitive damages, and costs, 15 U.S.C. § 1681n(a)(3), and thus courts reason that this provides "sufficient incentive for bringing individual claims." Gardner, 2007 WL 2261688 at *6 (reasoning that attorney's fee provision, which allows pursuit of claims "without incurring financial detriment, weighs against a finding of class action superiority over other litigation mechanisms"); Klotz v. TransUnion L.L.C., 246 F.R.D. 208, 217 (E.D. Pa. 2007) (rejecting superiority based on availability of attorney's fees and punitive damages for willful FCRA violations and reasoning that such incentives "dispel the notion that a class action is the only way to adjudicate the lawfulness of the defendant's practices"); Hoffer v. Landmark Chevrolet Ltd., 245 F.R.D. 588, 603 (S.D. Tex. 2007) (rejecting certification of FCRA class and reasoning that "if the consumer statute provides incentives such as punitive damages and attorney's fees to make individual suits worth filing, the consumer class action is likely not superior to individual suits"); Pendleton v. Trans Union Sys. Corp., 76 F.R.D. 192, 198 (E.D. Pa. 1977) (reasoning that "despite the fact the damages recoverable even in successful FCRA cases are likely to be small, individual actions are viable because the Act provides for recovery of counsel fees by successful plaintiffs"); Stillmock, 2009 WL 595642, *6 (finding class action to be "inferior" to suits by

individual plaintiffs who could file their own actions "in a court that may be more convenient for them than the District of Maryland").

159.    The record demonstrates that the type of claim at issue in this case will be brought absent class treatment.  Mr. Hervol previously brought such a claim an individual claim against American Express,  Barbella Dep. Ex. 18, and three of the lawyers representing Plaintiff in this case were prepared to prosecute such a claim against an individual defendant.  Smith Cert., Ex. D.

160.    The record reflects numerous further instances of people asserting individual claims of the type at issue, including Mr. Ferrarelli.  As reflected in the Amended Complaint, Mr. Ferrarelli was able to retain two lawyers to handle his case, and those lawyers think that individual claim is sufficiently valuable to justify obtaining expert testimony to support the claim for emotional-distress damages.  Smith Dec., Ex. A and B.

161.    Likewise, the case law cited to the Court demonstrates that individual claims of this nature can and are filed and litigated.  Thus, there is no reason to concentrate these claims in the District of Colorado.  By seeking a nationwide class, Plaintiff seeks to draw in people who potentially are located throughout the United States to Colorado.  Indeed, the actions of Mr. Ferrarelli reflect that he would rather litigate in a court that is "more convenient for [him] than the District of [Colorado]."  Stillmock, 2009 WL 595642, *6.

162.    Additionally, the class members are very likely to be aware of activities relating to credit reporting and credit report access and to have been advised by counsel in these areas. The class includes people who raised with American Express (and likely other entities) a claim

that accounts were opened through fraud. Thus, these people already discovered that they had been the victims of fraud and already had taken steps to address the resulting issues (most likely, as with Plaintiff, with the assistance of counsel). Accordingly, this is not a situation in which class members would be unaware of a claim they may have against American Express in the absence of class treatment. In sum, the record and the law demonstrate that individual actions for the claim at issue in this case are viable, and thus a class action is not superior.

> **3. The Tenth Circuit Rejects Class Actions Involving Statutory Claims and No Actual Damages**

163. Efforts to aggregate a large number of statutory claims in the absence of any claim of actual damages raises due-process and fairness concerns, and thus a class action is not a superior way to proceed. See Wilcox v. Commerce Bank of Kansas City, 474 F.2d 336 (10th Cir. 1973) (affirming denial of class certification in an action seeking statutory damages under the Truth in Lending Act because a class action was not superior to other methods "where the complaint contains no indication of any actual damages in substantial or provable amount" and "the aggregate relief would be oppressive in consequence and difficult to justify").

164. Other courts have followed the reasoning of Wilcox, including in the FCRA context. See, e.g. London v. Wal-Mart Stores, Inc., 340 F.3d 1246, 1255 n.5 (11th Cir. 2003) (citing Wilcox and reasoning that "even though economic harm is not an element" of claim at issue "it may be required for superiority under the Federal Rules of Civil Procedure" especially when potential liability is "out of proportion to any harm suffered by the plaintiff"); Evans v. U-Haul Co., 2007 U.S. Dist. LEXIS 82026, *10-12 (C.D. Cal. Aug. 14, 2007) (following in FCRA context the "many courts" that rejected superiority finding where there is no evidence of actual

harm and aggregate statutory damages would be large and citing <u>Wilcox</u>); <u>Soualian v. Int'l</u>

<u>Coffee & Tea LLC</u>, 2007 WL 4877902, *2 (C.D. Cal. June 11, 2007) (citing <u>Wilcox</u> in FCRA

case and rejecting superiority "because of the disproportionality of the damages award in relation

to the harm actually suffered by the class").

165.     Here, Plaintiff does not contend that he suffered, and does not seek recovery for,

any actual damages or any economic injury.  Plaintiff contends that at least 11,000 alleged

violations are implicated, which could result in statutory damages of $11,000,000.  <u>See</u>

Plaintiff's Memo of Law at p. 16.  Such an amount is plainly out of proportion as there is

absolutely no allegation of any actual damages, and thus a class action is not superior.

### 4.     American Express's Proactive Steps Defeat Superiority

166.     The record reflects proactive steps by American Express, and thus class

certification is not appropriate.

167.     The record reflects that while Plaintiff never raised any concern about access to

his consumer credit report, American Express proactively addressed and resolved any issue.

After the issue was identified in 2006, American Express put together a team, identified the

relevant fraud accounts, devised a strategy flag solution, and then implemented the strategy flag

for all relevant accounts by October 10, 2006.

168.     Courts recognize that class-action treatment is not superior where a defendant

takes action on its own to address an issue.  <u>See, e.g.</u>, <u>Soualian</u>, 2007 WL 4877902, *3 (rejecting

class action where alleged violation at issue remedied because defendants "demonstrated good

faith and nullified any deterrence benefit that might have been derived from a class action");

Evans v. U-Haul Co., 2007 U.S. Dist. LEXIS 82026, *19-20 (same).

# RECOMMENDATION

**WHEREFORE**, based upon these findings of fact an conclusions of law, this court

**RECOMMENDS** that Plaintiff's Motion for Class Certification (docket no. 60) be

**DENIED**.

**NOTICE:  Pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b)(2), the parties have fourteen (14) days after service of this recommendation to serve and file specific written objections to the above recommendation with the District Judge assigned to the case.  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  The District Judge need not consider frivolous, conclusive, or general objections.  A party's failure to file and serve such written, specific objections waives *de novo* review of the recommendation by the District Judge, Thomas v. Arn, 474 U.S. 140, 148-53 (1985), and also waives appellate review of both factual and legal questions.  Makin v. Colorado Dep't of Corrections, 183 F.3d 1205, 1210 (10th Cir. 1999); Talley v. Hesse, 91 F.3d 1411, 1412-13 (10th Cir. 1996).**

Done this 22nd day of April 2010.

BY THE COURT

s/ Michael J. Watanabe
MICHAEL J.WATANABE
U.S MAGISTRATE JUDGE